UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

     - v. -

MICHAEL JAMES,

        Defendant.
------------------------------------------------------------X

10 Cr. 1293 (RPP)

**OPINION AND ORDER**

**ROBERT P. PATTERSON, JR., U.S.D.J.**

  On September 15, 2011, Defendant Michael James ("James" or the "Defendant") filed a motion to suppress physical evidence and statements he allegedly made at the time of his arrest. On November 3, 2011, the Government responded in opposition to the motion. On December 6, 2011, the Court conducted an evidentiary hearing on the matter. For the following reasons, the Defendant's motion to suppress is denied.

**I. Facts[1]**

  On December 1, 2010, New York City Police Department ("NYPD") detectives Mark Moran ("Moran") and Julio Negron ("Negron") of the Bronx gang squad (collectively, the "detectives") were conducting surveillance near the intersection of White Plains Road and 230th Street in the Bronx, New York. (Transcript of December 6, 2011 Hearing ("Tr.") at 3-4.) White Plains Road is a two-way street running north-south, with the northbound lanes divided from the southbound lanes by solid double-yellow lines. (Id. at 4-5.) Moran and Negron were seated in an unmarked police car which was parked on the eastern side of White Plains Road facing northbound, approximately 10 car lengths south of 230th Street. (Id. at 5, 20, 62.) The detectives were on the lookout for a possible drug transaction involving Michael James, and had

---

[1] The following facts are taken from the December 6, 2011 evidentiary hearing testimony of Mark Moran, a first grade detective and 24-year veteran of the New York City Police Department ("NYPD"); Julio Negron, a detective and 14-year veteran of the NYPD; and Michael Zeppieri, a Special Agent and supervisor with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

1

been given a brief physical description of James by federal agents, which included the clothes he would be wearing. (Id. at 21, 23, 70.)

At approximately 4:30 p.m., the detectives observed a man and a young girl with a knapsack on her back walking westbound on 230th Street toward White Plains Road. (Id. at 5-7, 46.) Moran testified that the man fit the description of James that the detectives had been given. (Id. at 22.) The detectives then observed the man and the young girl turn and walk northbound on White Plains Road. (Id. at 6.) Soon thereafter, the man flagged down a passing minivan that was heading south. (Id. at 6, 47.) When the minivan got to be approximately six or seven car-lengths from where the detectives were parked, it made a U-turn over the double-yellow lines, and proceeded northbound toward the man and the young girl. (Id.) When it reached them, the minivan pulled over to eastern side of the Street, and the man and young girl got inside. (Id. at 6.) The detectives observed that the minivan had dark tinted windows. (Id.)

The detectives followed the van northbound on White Plains Road for approximately one block before pulling it over. (Id. at 7, 47.) They then exited their vehicle and approached the van, with Moran going to the driver's side, and Negron to the passenger side. (Id. at 7-8.) Moran testified that when he reached the vehicle, the driver's window was open, and he could see the driver seated behind the wheel, and the Defendant seated in the front passenger seat. (Id. at 8.) After the driver was unable to produce his license or registration, Moran asked him to step out of the van, and to move to the rear of the vehicle. (Id. at 9-10.) The driver exited the van, and, as he was walking to the rear of the vehicle, told Moran that he didn't have a license and was acting as a livery in order to make money for his family. (Id. at 9.) Once at the rear of the vehicle, Moran asked the driver "if he had a problem with me searching his car." (Id.) Moran testified that the driver responded, "[n]o. You can look in the car." (Id.)

Meanwhile, Negron testified that as he approached the front passenger door of the van, someone rolled the window down. (Id. at 72.) By the time Negron got within two feet of the open window he was able to detect a "strong, pungent, skunky smell." (Id. at 49.) Negron testified that he had smelled this odor "hundreds" of times throughout his 14-year career with the NYPD, and that it was consistent with the packaging of marijuana. (Id. at 49-50.) Negron asked the Defendant, who was seated in the front passenger seat, if "there is anything in this vehicle that I should know about." (Id. at 50.) When the Defendant didn't respond, Negron pulled him out of the van, patted him down, and then sent him to the back of the vehicle where Moran was standing with the driver. (Id.) At this point, Moran signaled to Negron that the driver of the van had given his consent to search the vehicle. (Id. at 77.) Negron asked Moran to watch the Defendant, and then went back to the passenger side of the minivan, and slid open the back passenger side door. (Id. at 10, 52.)

When the door slid open, Negron observed the young girl seated directly behind where the Defendant had been seated, with a brown Gucci knapsack around her shoulders. (Id. at 52; see id. at 30.) Negron asked the girl to exit the vehicle, but before doing so, she slid the knapsack off of her shoulders and onto the seat in which she had been sitting. (Id. at 52-53.) At this point the odor of marijuana became more intense, and Negron asked the young girl to step to the back of the vehicle where Moran was located. (Id.) Negron then opened the knapsack and observed that it contained a white plastic trash bag, inside of which were vacuum-sealed clear plastic freezer bags containing packaged marijuana. (Id. at 13, 54, 66.) After making this observation, Negron signaled to Moran to arrest the individuals, and the driver and the Defendant were placed in handcuffs. (Id. at 10, 54, 55.) Moran then walked to the passenger side of the

3

van and observed the knapsack, which had been opened up to reveal the marijuana inside. (Id. at 11.)

Soon thereafter an NYPD field team arrived on the scene and helped to transport the driver of the van, the Defendant, and the young girl (who was identified as the Defendant's daughter) to the 47th precinct. (Id. at 13, 31.) When they arrived at the precinct, the young girl was placed in the juvenile detention room, and her mother was contacted and told to come and pick her up. (Id. at 14, 33.) The detectives then brought the Defendant upstairs into the precinct's debriefing room. (Id.) Before asking any questions, Moran read the Defendant his Miranda rights off an NYPD statement form ("statement form"), pausing after issuing each warning to ensure that the Defendant understood. (Id. at 15.) If the Defendant indicated that he understood the warning, Moran wrote "yes" next to the text of the warning on the statement form, and then asked the Defendant to initial next to the "yes." (Id.) The Defendant indicated that he understood each of the warnings, and initialed each time. (Id. at 16-17, 58-59; see Govt. Ex. 1.) Both Moran and the Defendant then signed the statement form, and the Defendant proceeded to answer the detectives' questions, and give a written statement indicating that the marijuana in the knapsack was his, and that he was selling it to make money. (Tr. at 17, 33, 57-59; see Govt. Ex. 1.) The Defendant's demeanor was calm throughout the interview, which lasted roughly 15 minutes. (Tr. at 18, 61.) After it was over, Moran, the Defendant, and Negron each signed their names at the bottom of the statement form. (Tr. at 57; see Govt. Ex. 1.)

After his conversation with the detectives, the Defendant was brought back downstairs and placed in a cell. (Id. at 18, 35, 61.) The detectives then issued a summons to the driver of the minivan for "uninsured for hire," and the driver was released. (Id. at 18, 26.) A couple of hours later, Special Agent Michael Zeppieri ("Zeppieri") of the Bureau of Alcohol, Tobacco,

4

Firearms and Explosives ("ATF") arrived at the precinct. (Id. at 36, 85.) Zeppieri spoke with Moran about the case, and was told that the Defendant had already been read his Miranda rights and had waived them and given a statement. (Id. at 86-87.) Zeppieri asked to speak with the Defendant, and the Defendant was once again taken upstairs and placed in the debriefing room. (Id. at 36, 87.) Zeppieri and ATF agent Andy Boss interviewed the Defendant for roughly 10 minutes, during which time the Defendant made a number of inculpatory statements.[2] (Id. at 87-91.) The Defendant was calm and respectful throughout this interview. (Id. at 87.) After the second round of questioning, the Defendant was placed in an NYPD car and taken by the detectives to central booking at 161st Street. (Id. at 93.) On the way to central booking, the Defendant pointed out a location to the detectives where he believed a large amount of marijuana was located. (Id. at 88.)

## II. Discussion

### A. Motion to Suppress Physical Evidence

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the [Supreme] Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution." Chambers v. Maroney, 399 U.S. 42, 51 (1970). "Probable cause to search is

---

[2] In its brief the Government alleges that,

> James told federal agents that (1) he had been dealing marijuana since about 2000; (2) that he sold pounds of marijuana several times per week; (3) that he knew an individual named "Gigi" [co-defendant Vincent Lawrence] who lived at 1488 Hicks Street, Bronx, New York and that Gigi was known to have 150 pounds of marijuana at his residence; (4) that James would link up marijuana customers with Gigi for approximately 10 to 20 pounds of marijuana at a time, which he did a couple of times per week for the previous 4 to 5 months; (5) James had seen marijuana in Gigi's place before; and (6) James will take the 5 years imprisonment.

(Govt. Mem. in Opp. to Def.'s Pretrial Mots. at 3.)

5

demonstrated where the totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" Walczyk v. Rio, 496 F.3d 139, 156 (2d Cir. 2007) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

> *1.     The Detectives had Reasonable Suspicion to Stop the Van*

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." United States v. Jenkins, 452 F.3d 207, 212 (2d Cir. 2006) (quoting␣Whren v. United States, 517 U.S. 806, 809-10 (1996)). "The stop of a vehicle must be reasonable in the circumstances presented, and an officer making a stop must have a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." Id. (quotations and citations omitted). The Second Circuit has "held repeatedly that a traffic stop based on a reasonable suspicion of a traffic violation comports with the Fourth Amendment." United States v. Stewart, 551 F.3d 187, 191 (2d Cir. 2009).

The detectives here testified credibly that they observed a minivan make a U-turn while traveling on White Plains Road, crossing over the double-yellow lines. New York Vehicle and Traffic Law section 1110(a) states that "[e]very person shall obey the instructions of any official traffic-control device applicable to him placed in accordance with the provisions of this chapter, unless otherwise directed by a traffic or police officer, subject to the exceptions granted the driver of an authorized emergency vehicle in this title." "Markings," such as double-yellow lines, are considered a traffic-control device under the law. See N.Y. Veh. & Traffic Law § 153; United States v. Torres, No. 10 Cr. 1159, 2011 WL 2209144, at *6 (S.D.N.Y. June 7, 2011) (Koetl, J.) (noting that officers' personal observations of an illegal U-turn gave them probable cause to believe that the driver of the vehicle had committed a traffic offense, which permitted

6

the officers to pull over the defendant's car). Additionally, officers had reasonable suspicion to believe that another violation had occurred based on their observation of the van's dark tinted windows. See N.Y. Veh. & Traffic Law § 375(12-a)(b) (setting forth limits on the tinting of vehicle windows)[3]; see also United States v. Lopez-Salcedo, No. 11 Cr. 482, 2011 WL 5838283, at *1 (S.D.N.Y. Nov. 18, 2011) (McKenna, J.) (holding that officers had a reasonable suspicion that car's tinted windows constituted a traffic violation, and thus had a lawful basis for stopping car). Therefore, the detectives had reasonable suspicion to pull over the van in which the Defendant was riding.

The Defendant argues that the detectives did not actually see the van make a U-turn, and that this portion of the testimony was fabricated in order to justify an otherwise illegal stop. As evidence of this, the Defendant points out that the interview notes of the Bronx Assistant District Attorney (the "ADA") who interviewed Moran shortly after the Defendant's arrest make no mention of the van making a U-turn. Furthermore, the Defendant points out that the driver of the van was never issued a summons for making an illegal U-turn. As a result, the Defendant argues

---

[3] N.Y. Veh. & Traffic Law § 375(12-a)(b) provides that:

No person shall operate any motor vehicle upon any public highway, road or street:

(1) the front windshield of which is composed of, covered by or treated with any material which has a light transmittance of less than seventy percent unless such materials are limited to the uppermost six inches of the windshield; or

(2) the sidewings or side windows of which on either side forward of or adjacent to the operator's seat are composed of, covered by or treated with any material which has a light transmittance of less than seventy percent; or

(3) if it is classified as a station wagon, sedan, hardtop, coupe, hatchback or convertible and any rear side window has a light transmittance of less than seventy percent; or

(4) the rear window of which is composed of, covered by or treated with any material which has a light transmittance of less than seventy percent. A rear window may have a light transmittance of less than seventy percent if the vehicle is equipped with side mirrors on both sides of the vehicle so adjusted that the driver thereof shall have a clear and full view of the road and condition of traffic behind such vehicle.

7

that the testimony of the detectives is not credible, and that all the evidence seized and statements made after the initial stop of the van must be suppressed.

While it is true that the interview notes of the ADA do not mention that the van made an illegal U-turn, this does not mean that Moran didn't mention the U-turn to the ADA, or that the U-turn didn't occur. The interview notes appear to have been made in a rushed fashion, and it is clear that they are not meant to provide a detailed account of the events of December 1, 2010. (See Def. Ex. B.) Furthermore, the notes state that the detectives "pulled over the vehicle due to the dark tints on the windows." (Id.) The ADA may have determined that the tinted windows provided a sufficient and independent basis for the stop, and thus that it was unnecessary to note the U-turn. The fact that the driver of the van was never issued a summons for an illegal U-turn is also of little probative value. As Moran testified, the driver was issued a summons for "uninsured for hire," and it was within Moran's discretion not to issue the driver a summons for every traffic violation he committed. (Tr. at 41.)

The Court concludes that the detectives testified truthfully regarding the U-turn and van's the tinted windows, and that these observations supplied the detectives with reasonable suspicion that a traffic violation had been committed, justifying their stop of the vehicle.

2. *The Search of the Van was Justified by the Driver's Consent*

It is undisputed that the police did not have a warrant to search the van, and thus the Government must demonstrate that the search was permissible under one of the "well-delineated exceptions" to the warrant requirement. Schneckloth v. Bustamante, 412 U.S. 218, 219 (1973). Voluntary consent is a well-established exception to the warrant requirement. United States v. Hernandez, 85 F.3d 1023, 1028 (2d Cir. 1996). "The official claiming that a search was consensual has the burden of demonstrating that the consent was given freely and voluntarily."

Anobile v. Pelligrino, 274 F.3d 45, 61 (2d Cir. 2001) (quotations and citations omitted). In making the voluntariness determination, "the ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." United States v. Isiofia, 370 F.3d 226, 230 (2d Cir. 2004).

Here, Moran testified credibly that the driver of the van consented to its search, and that he relayed this information to Negron, who carried out the search. The consent was given while Moran was standing with the driver at the back of the van, before the driver had been placed under arrest. Moreover, the driver's consent was explicit and unambiguous. Thus, the Court finds that the detectives were justified in conducting a search of the van, which led to the discovery of the knapsack.[4]

            3.      *The Search of the Knapsack was Justified Under the Automobile Exception*

However, the driver's consent to search the van does not extend to Negron's search of the knapsack found inside of the van. See, e.g., United States v. Perea, 986 F.2d 633, 642 (2d Cir. 1993) (court need not resolve the issue of whether cab driver consented to a search the trunk of the cab, as this consent would not have extended to the further search of passenger's duffle bag located inside of the trunk.) In order to justify the search of the knapsack, the Government must demonstrate that some other exception to the warrant requirement applied.

Pursuant to the "automobile exception," police may conduct a warrantless search of a vehicle and the containers within it where they have a probable cause to believe that contraband or evidence is contained therein. California v. Acevedo, 500 U.S. 565, 580 (1991). Probable cause to conduct a warrantless search of an automobile exists "where 'the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy

---

[4] Notably, the Defendant did not contest the voluntariness of the driver's consent to search in his brief, nor did he raise the issue in his argument following the evidentiary hearing.

9

information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' evidence of a crime will be found in a place to be searched." United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004) (quoting Brinegar v. United States, 338 U.S. 160, 175-76 (1949)).

Here, Negron was able to detect the "strong, pungent, skunky smell" of packaged marijuana when he first approached the van, an odor which intensified as he got closer to the knapsack. (Tr. at 49, 52.) Accordingly, Negron's search of the knapsack was justified, as the strong odor of packaged marijuana emanating from it provided Negron with probable cause to believe that contraband would be found inside. See United States v. Downs, 151 F.3d 1301 (10th Cir. 1998) (strong smell of raw marijuana emanating from defendant's vehicle at time of traffic stop gave officer probable cause to search the vehicle's trunk); United States v. Winters, 221 F.3d 1039 (8th Cir. 2000) (smell of raw marijuana created probable cause for officer to search defendant's car and its containers after officer stopped defendant for speeding); cf. United States v. Jenkins, 452 F.3d 207, 214 (2d Cir. 2006), cert. denied, 549 U.S. 1008 (2006) (holding that the odor of marijuana emanating from a car provided officers with a "particularized and objective basis for suspecting legal wrongdoing.").

The Defendant contends that Negron was determined to search the knapsack based on the tip the detectives received, which indicated that the Defendant was in possession of narcotics. Accordingly, the Defendant argues that Negron's testimony that he could smell the odor of marijuana through the open passenger window of the van is not credible, especially given Moran's testimony that he could not smell the odor from the open driver's side window. However, as Negron testified, the knapsack that contained the marijuana was on the shoulders of the young girl, who was seated directly behind the Defendant, on the passenger side of the van.

Thus, it is reasonable that Negron would be able to detect the odor from the front passenger window even if Moran, who was at the driver's side, could not.

As further evidence of Negron's unreliability, the Defendant submits the state court complaint report from the case ("complaint report"), containing the sworn affidavit of Moran, which states that he observed the knapsack in the Defendant's possession in that the knapsack "was located on the floor of the vehicle where the defendant was seated." (Def. Ex. B.) The Defendant argues that this discrepancy "is another clear example of this officer twisting the truth to meet what he knows is an illegal stop and search." (Tr. at 105.) However, both detectives testified that it was Negron who initially discovered the knapsack and searched it, not Moran. Thus, though Moran's testimony at the hearing may be inconsistent with his prior statements contained in the complaint report, this has no bearing on the credibility of Negron's testimony at the hearing, especially given Negron's testimony that he never reviewed the complaint report. (Id. at 79.)

The Court credits Negron's testimony that he was able to smell the packaged marijuana when he first approached the van, and that this odor intensified when he opened the side door next to where the young girl was seated with the knapsack. Thus, for the reasons given above, he was justified in searching the knapsack itself.

B. **Motion to Suppress Statements**

In order to establish a valid waiver of Miranda rights, the Government must show that the Defendant's relinquishment of his rights was voluntary, and that he had a full awareness of the right being waived and the consequences of the waiver. Moran v. Burbine, 475 U.S. 412, 421 (1986). "Only if the totality of the circumstances surrounding the interrogation reveal both an

uncoerced choice and the requisite level of comprehension may a court properly conclude that Miranda rights have been waived." Id.

The Defendant argues that that the Government has not met this burden, and that he was coerced by the detectives into waiving his rights and giving a statement. Specifically, the Defendant argues that officers told him that if he did not talk to them, they would arrest his daughter and send her to jail. (Aff. of Michael James dated September 14, 2011, Decl. of Alice L. Fontier, Esq. dated September 15, 2011, Ex. 3 ¶ 15.) In contrast, the detectives testified at the evidentiary hearing that no such threats were made (Tr. at 17-18, 60-61), and that the Defendant was informed that the detectives were going to call someone to come and pick his daughter up from the precinct (Id. at 32-33). As the Defendant chose not to testify at the hearing, the declarations set forth in his affidavit are entitled to less weight than the testimony of the detectives. See United States v. Al-Marri, 230 F. Supp. 2d 535, 539 (S.D.N.Y. 2002) ("this Court follows the lead of other federal courts in valuing the weight of live witnesses' testimony over the contents of a defendant's affidavit, and gives lesser consideration to [the defendant's] version of the facts."). Furthermore, the Government submitted the NYPD statement form into evidence which contains the word "yes" and the Defendant's initials next to each Miranda warning, and the Defendant's signature in two places. (See Gov. Ex. 1.) Given the credible testimony of the detectives, and the signed and initialed statement form, the Court concludes that the Government has met its burden of proving that the Defendant's waiver was knowing, intelligent, and voluntary.

Finally, the Defendant argues that, even if his statements to the detectives are admissible, his statements made to the ATF agents a few hours later must be suppressed, as the Defendant was not given his Miranda warnings a second time. In Wyrick v. Fields, the Supreme Court

12

rejected the contention that the mere passage of time required the re-administration of Miranda warnings, and held that renewed warnings were not required "unless the circumstances changed so seriously that [the defendant's] answers no longer were voluntary . . . ." 459 U.S. 42, 47 (1982); see also United States v. Davis, No. 06 Cr. 911, 2009 WL 637164, at *12 (S.D.N.Y. Mar. 11, 2009) (Sand, J.) (resumption of interrogation after overnight custody did not require renewed Miranda warnings). Furthermore, the fact that NYPD detectives issued the initial warnings and ATF agents conducted the subsequent interrogation is irrelevant, as the Second Circuit has held that

> [w]hen a Miranda warning is given to a person in custody by someone known by that person to be a law enforcement agent, whether the sovereign of the agent who gave the warning is the same as the sovereign of the agent to which the defendant later gives an incriminating statement is of no moment.

United States v. Banner, 356 F.3d 478, 480 (2d Cir. 2004), vacated on other grounds sub nom. Forbes v. United States, 543 U.S. 1100 (2005). As such, the statements made by the Defendant in his subsequent interview with Special Agent Zeppieri are admissible, given his initial waiver.

## III. Conclusion

For the foregoing reasons, the Defendant's motion to suppress the marijuana recovered from the knapsack, the statements made to the NYPD detectives, and the statements made to the ATF agents, is denied. Trial is set for January 23, 2011, with the parties' proposed voir dire, requests to charge, and motions in limine due by January 11, 2011.

IT IS SO ORDERED.

Dated: New York, New York
December 16, 2011

Robert P. Patterson, Jr.
U.S.D.J.

13

**Copies of this order were faxed to:**

*Counsel for Defendant:*
Alice L. Fontier
Law Offices of Joshua L. Dratel, P.C.
2 Wall Street, 3rd Floor
New York, NY 10005
Tel: (212)-732-0707
Fax: (212)-571-3792
Email: afontier@joshuadratel.com

*The Government:*
Michael Quinn English
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007
Tel: (212) 637-2594
Fax: (212) 637-2527
Email: michael.english@usdoj.gov